## SAMUEL COHEN AND ANOTHER v. JAMES F. GOULD AND ANOTHER.[1]

No. 27,019.

May 10, 1929.

[1]Reported in 225 N. W. 435.

*Toivonen & Harri* and *George Nordlin,* for appellants.

*G. A. Youngquist,* Attorney General, and *Chester S. Wilson,* Assistant Attorney General, for respondents.

STONE, J.

Replevin for 680 muskrat skins which in December, 1926, were seized by defendants as game wardens of the state of Minnesota. Defendant Gould was at the time the acting commissioner of game and fish. A verdict was directed for defendants, and plaintiffs appeal from the order denying their motion for a new trial.

Plaintiffs are engaged in the fur business at Duluth as copartners under the name of Hudson Bay Fur Company. They have a branch office across the Saint Louis river in Superior, Wisconsin, which is operated under the name of Lake Superior Fur Company. The furs in question were purchased by one Symons at the latter place. December 15, 1926, during a closed season on muskrats in Minnesota, they were shipped to the Superior Fur Dressing Company in Minneapolis. There the shipment was seized by defendants. The furs were in two bags. They bore no official tags or seals of the commissioner of game and fish of this state and nothing to show the legality of their original taking or of the then possession of them by plaintiffs. In that situation there was a statutory presumption that the skins had been unlawfully taken. G. S. 1923 (1 Mason, 1927) § 5512. In one sack there were ten and in the other 12 pelts showing that the animals from which they were taken had been killed by shooting or spearing, methods which were then and for some time had been prohibited in Wisconsin (Wisconsin St. 1927, c. 29, § 29.24) where the skins had been taken and where they were purchased by plaintiffs. Under the statutes hereinafter to be considered, particularly G. S. 1923 (1 Mason, 1927) § 5633, the presence in the shipments of the skins of muskrats which had been shot or speared made the whole consignment prima facie contraband and subject to seizure.

■ It is argued for plaintiffs that G. S. 1923 (1 Mason, 1927) § 5547, is unconstitutional. It provides in part as follows:

"Nothing in this act [L. 1919, c. 400] shall be construed as prohibiting the buying, shipping or having in possession at any time, of the skins of fur-bearing animals legally killed within or without the state * * * upon proof that the hides were so taken."

This should be read in connection with portions of §§ 5541, 5631, and 5633. Under G. S. 1923, § 5541 (as amended by L. 1925, p. 489, c. 380, § 1) 1 Mason Minn. St. id. "any person desiring to retain in possession during the closed season the skins of protected fur-bearing animals" may obtain from the commissioner distinctive tags known as retaining tags for the pelts so to be retained, and "such pelts lawfully tagged may be bought and sold at any time." Section 5631 authorizes the seizure and confiscation in the name of the state of any wild animal or part thereof "caught, killed, taken or had in possession or under control, or sold or transported in violation of this chapter." By § 5633 it is declared that "confiscation of any part of a shipment shall include the entire shipment, and whenever two or more wild animals, carcasses or parts thereof, are packed, stored or contained in the same * * * receptacle, or are otherwise commingled and one or more thereof are contraband, then and in such case the whole shipment or parcel shall be deemed contraband."

The title of L. 1919, p. 427, c. 400 (of which the sections just referred to are a part) is an act to amend "and codify the laws of this state relating to the preservation, protection and propagation of wild animals, including quadrupeds, birds and fish of both this and other states, and to repeal certain laws relating thereto." The reference to the wild life of other states and the protection thereof is not an attempt to give to Minnesota law extraterritorial effect. The intention is rather and only to extend to the game laws of other states that consideration and such co-operation by the officials enforcing the laws of Minnesota as is demanded by comity for the purpose of giving all such laws their intended and proper local

effect. To that end § 5547 legalizes the possession in this state of the skins of fur-bearing animals legally killed in other states.

The thing of which present complaint is made upon the ground of unconstitutionality is that the burden is put upon the possessors of skins brought from other states of producing proof that the hides were legally killed therein. That requirement, it is argued, is beyond the scope of the title of the act and its subject matter not expressed therein as required by art. 4, § 27, of the state constitution. State v. Chapel, 63 Minn. 535, 536, 65 N. W. 940. In that case a statutory provision the only purpose of which was to furnish aid in the enforcement of the laws of other states and the protection of wild life therein was held unconstitutional because the title was narrowly restricted to the purpose of the protection of "the game and fish of the state of Minnesota." Plainly the reference in the title above quoted of L. 1919, p. 427, c. 400, to the wild life "of both this and other states," prevents any such objection to the provisions thereof now in question. The provision putting upon the possessor of imported furs the burden of proof that they were legally taken is in § 53 of the original act. Plainly, it is within the enlarged reach of the title, which includes the "quadrupeds, birds and fish" of this and other states.

■ The imposition of the burden of proof of legality upon the possessor of imported furs is next objected to upon the ground, as we understand it, of its being so arbitrary and unreasonable as to deny due process and the equal protection of law. The attack is not upon the manner in which the law was attempted to be enforced in the instant case but upon the statute as it stands. Plaintiffs construe it as requiring "one who buys furs in the open markets of other states to submit more proof in this state of the legality of the skins than is necessary to legalize the sale of the skins in those states." We find nothing to indicate that any such extreme construction is warranted or attempted. The record shows only that plaintiffs' entire shipment was considered contraband because each of the two parcels contained a number of pelts which had been taken from animals killed by shooting or spearing, which is prohibited in Wisconsin. Wisconsin St. 1927, c. 29, § 29.24.

Recently, in Waldo v. Gould, 165 Minn. 128, 206 N. W. 46, we had occasion to consider generally the result and purposes of the statute now drawn in question. It is not necessary to reiterate the conclusions then reached, except to repeat that the theory of the statute is that the state in its sovereign capacity and in trust for its people has the title to the wild game therein and that it may be reduced to the possession and ownership of individuals only as permitted by and subject to the conditions imposed by the statute.

Such police measures as our game laws would be futile indeed if they did not provide measures of enforcement adequate to oppose successfully the devices of those whose interest it is to violate them. We take judicial notice that much business is done in Minnesota in the sale at wholesale and retail and in the manufacture of furs; that the latter are imported in large quantities not only from adjoining states but also from Canada; and that law-abiding fur dealers and manufacturers do not seem to have had much difficulty in obeying our laws and the requirements of the officials charged with the enforcement thereof. In the case supposed by counsel, of a purchase by a Minnesota dealer of furs confiscated and lawfully sold by authority of Manitoba, no Minnesota official would question the shipment were it accompanied by an invoice from the Manitoba official showing the lawful sale by him. It is no objection to a police measure that it imposes upon citizens some but not an unreasonable burden of taking pains to see that the law is obeyed and to satisfy the officials charged with its enforcement that it is obeyed.

This is enough, we think, to show that the provision of G. S. 1923 (1 Mason, 1927) § 5547, putting upon the possessor the burden of proving that the skins of fur-bearing animals imported from other states were legally killed therein, is not, when read in connection with the whole act of which it is a part, so unreasonable or arbitrary as to be either a denial of due process or the equal protection of the laws. The law itself provides a convenient means of furnishing such proof whenever the furs are in fact legally taken. Those who make a business of buying and shipping furs are not so incompetent

in their trade as to be unable to accompany any package of furs with something in the way of invoice or manifest showing its origin and history. No obstacle to anything of that kind was present in the case of the furs now involved. If and when enforcement officials resort to the arbitrary and unreasonable in their requirements of proof of legality, another question may arise. It is not now presented.

The argument for plaintiffs stresses Linden v. McCormick, 90 Minn. 337, 96 N. W. 785, and its holding that under the circumstances of that case the owner of certain moose hides in his possession during a closed season was not required to prove that the animals from which such skins were taken were lawfully killed. Linden's possession of the skins was under such circumstances that he was entitled to the presumption that "they came lawfully, rather than unlawfully," into his possession. There being no proof to the contrary, he was plainly entitled to and obtained a favorable decision. Under the present law, the burden was upon plaintiffs to supply reasonable proof that the skins had been legally taken. Cohen v. Kauppi, 172 Minn. 469, 215 N. W. 837.

■ A final claim of unconstitutionality arises from the extent to which the statute may interfere with interstate commerce. It seems to be disposed of by an act of congress the purpose of which is to prevent interstate commerce in furs which will aid the violation of state law for the conservation of wild life. The federal criminal code (18 USCA, § 395) provides that all dead bodies and parts thereof of game animals transported into any state or territory or remaining therein for use, consumption, sale or storage "shall upon arrival in such state or territory be subject to the operation and effect of the laws of such state or territory enacted in the exercise of its police powers, to the same extent and in the same manner as though" they had been produced therein.

There is nothing in this case subjecting it to the rule of Foster-Fountain P. Co. v. Haydel, 278 U. S. 1, 49 S. Ct. 1, 73 L. ed. 1. The thing which there proved fatal to a statute of Louisiana was that in its effect it went far beyond a mere measure for the proper

conservation of shrimp and forbade the shipment out of the state of raw and unshelled shrimp while permitting the same, if produced and prepared within the state, to be freely shipped out of it. The purpose of the law was not to preserve to the people of the state for their own use the food supply in question but to compel the process of manufacture to be carried on within rather than without the state. In consequence the law was held to be so directly aimed at and burdensome upon interstate commerce as to violate the federal constitution. There is nothing of that kind in the statutes presently involved. Compare New York ex rel. Silz v. Hesterberg, 211 U. S. 31, 29. S. Ct. 10, 53 L. ed. 75, and LaCoste v. Dept. of Conservation, 263 U. S. 545, 44 S. Ct. 186, 68 L. ed. 437.

■ Although there is some such suggestion, there is no direct proof that any of the skins were taken out of season, and the case was not disposed of below upon that theory. Neither, as we understand the record, did defendants make the seizure upon that ground, their action being due solely to the presence of the shot and speared skins. That was the theory of the trial and decision below.

The proof is that the shot and speared skins were taken by Indians on the Menominee reservation in Wisconsin. Whether they maintained their original tribal relation or had received allotments of tribal land by patent and had become citizens of the United States does not appear. It would be important, if they were controlling, to know the facts in that connection. There has been much and interesting argument as to the status of Indians on the Menominee and other reservations and the question whether they are amenable to such state police measures as those now involved. The claim for plaintiffs is that they may hunt and trap at will and take fur-bearing animals as they please. State v. Campbell, 53 Minn. 354, 55 N. W. 553, 21 L. R. A. 169; Selkirk v. Stephens, 72 Minn. 335, 75 N. W. 386, 40 L. R. A. 759; State v. Cooney, 77 Minn. 518, 80 N. W. 696, Witnesses for plaintiffs frankly admit that on the Menominee reservation the Indians get muskrat pelts as best they can, by trapping, shooting or spearing, as occasion offers. But we consider this point disposed of favorably to plaintiffs by a con-

trolling statute of Wisconsin. Wisconsin St. 1927, c. 29. Originally enacted as Laws, Wis. 1917, p. 1197, c. 668, it was entitled an act to repeal enumerated sections, and to create a new chapter "relating to wild animals, and the regulation of the enjoyment, disposition and conservation thereof, prescribing penalties, and creating a conservation fund." By § 29.09 it is provided that "Indians hunting, fishing or trapping off Indian reservation lands are subject to all provisions of this chapter." To apply that law to Indians generally, even when on their reservations, is to make the reference to them when *off* their reservation meaningless. "Such an interpretation of the law as this would violate all proper canons of construction." It would in effect say that a legislature had enacted "a saving clause which can have no real operation at all, and can subserve no actual purpose whatever." State v. Showers, 34 Kan. 269, 272, 8 P. 474.

We must, if possible, avoid an interpretation which renders a complete sentence of the statute surplusage and so in effect amends the law by striking out that sentence. It can be done by assuming an implicit recognition by the Wisconsin legislature of the traditional freedom of tribal Indians on their reservations from the restraints and penalties of the criminal laws of the state and an intention to avoid complications by making the game laws applicable to Indians only when off their reservations. The statute is creative of new offenses, unknown to the common law. "What is expressed is exclusive" when it is creative and in derogation of existing law or some provisions of the particular act. 2 Lewis' Sutherland St. Const. (2 ed.) § 491.

"Where a statute enumerates the persons or things to be affected by its provisions, there is an implied exclusion of others; there is then a natural inference that its application is not intended to be general." Id. § 493.

So here, the statute having *expressly* made itself applicable to Indians *off* their reservations, and such an explicit statement of effect being meaningless if it was the intention to reach Indians generally, the inference follows that it was not the intention to

affect them while *on* their reservations. The particular reservation as to Indians controls the application of the law to them as against general provisions of the act having no such particular application. Such "specific provisions relating to a particular subject must govern in respect to that subject, as against general provisions in other parts of the law, which might otherwise be broad enough to include it." Felt v. Felt, 19 Wis. 208, 212. In the absence of a different construction by the supreme court of Wisconsin, the final arbiter of the question, we adopt that view. In consequence, on the record before us, we conclude that the skins in question taken by the Menominee Indians on their reservation by shooting and spearing were lawfully taken. That is because, as we construe the applicable law of Wisconsin, there was no prohibition of such taking. It follows that the order appealed from must be reversed.

We do not overlook the Wisconsin statute (Wisconsin St. 1927, c. 29, § 29.41) making it unlawful for any person to have in his possession any muskrat skin "showing that the same has been shot or speared." But if the views last above expressed are correct, that does not make unlawful the shooting or spearing of them by tribal Indians on their reservations in Wisconsin. So our own statute [G. S. 1923 (1 Mason, 1927) § 5547] requiring only proof that the animals were "legally killed * * * without the state," and not that the possession of them without the state was at all times lawful, is satisfied by the evidence that the killing was by Indians on their reservation in Wisconsin.

Order reversed.

HILTON, J. took no part.

HOLT, J. (dissenting).

I fully agree with the opinion except paragraph 4. G. S. 1923 (1 Mason, 1927) § 5547, reads:

"Nothing in this act shall be construed as prohibiting the buying, shipping or having in possession at any time, of the skins of fur-bearing animals legally killed within or without the state, and of the hides of moose or deer legally killed within or without the state, upon proof that the hides were so taken."

State v. Campbell, 53 Minn. 354, 55 N. W. 553, 21 L. R. A. 169; Selkirk v. Stephens, 72 Minn. 335, 75 N. W. 386, 40 L. R. A. 759; State v. Cooney, 77 Minn. 518, 80 N. W. 696, appear to me to lead to the conclusion that while the state does not interfere with the taking of fish, game, or fur-bearing animals by tribal Indians on their reservation, yet if killed or taken in a manner prohibited the same cannot be kept off the reservation or become a subject of lawful traffic. In my opinion Wisconsin St. 1927, § 29.09, does not impliedly legalize the killing by Indians of muskrats by shooting or spearing upon Indian reservations so that such skins may be acquired and possessed lawfully off the reservation. It reads:

"Indians hunting, fishing or trapping off Indian reservation lands are subject to all provisions of this chapter."

One of the provisions of § 29.41 reads:

"The skin of any fur-bearing animal lawfully killed, when separated from the rest of the carcass is not subject to the provisions of this chapter; but no person shall have in his possession or under his control the skin of any fisher, martin, mink, or muskrat showing that the same has been shot or speared."

This would seem to be aimed at preventing the traffic in the skins of muskrats shot or speared, because the possession of such skins is at all times unlawful. It would be impossible for anyone lawfully to carry them off an Indian reservation. State v. Morrin, 136 Wis. 552, 117 N. W. 1006; Cohen v. State, 180 Wis. 352, 192 N. W. 992, are not out of line with our decisions above cited. I think that the fact that in the confiscated packages were found skins showing that the animals had been shot or speared made such skins contraband both in Minnesota and Wisconsin.

### ON APPLICATION FOR REARGUMENT.

On May 24, 1929, the following opinion was filed:

PER CURIAM.

Both plaintiffs and defendants have filed petitions for rehearing, and both petitions are hereby denied. That on behalf of defendants

expresses concern lest some of the things said in the opinion may be taken as passing final judgment upon the effect of the evidence. Nothing of that kind was intended, and in the event of a new trial the fact issues should not be embarrassed or in any way influenced by anything said here. A verdict was directed for defendants upon the theory that muskrats could not lawfully be shot and speared by the Menominee Indians on their reservation in Wisconsin. In that, for the reasons' we have stated, we think there was error. In consequence, a reversal followed, and the case must go back for a new trial.

