**Carol H. SUNDBERG, et al.,
Respondents,**

**v.**

**LAMPERT LUMBER COMPANY, et al., Appellants.**

**No. C5–85–2135.**

Court of Appeals of Minnesota.

July 8, 1986.

Review Denied Sept. 22, 1986.

---

John J. McGirl, Jr., Doherty, Rumble & Butler, Minneapolis, for respondents.

Paul R. Hannah, Oppenheimer, Wolff, Foster, Shepard & Donnelly, St. Paul, for appellants.

Heard, considered and decided by POPO-VICH, C.J., and NIERENGARTEN and RANDALL, JJ.

## OPINION

NIERENGARTEN, Judge.

The trial court ordered appellant Lampert Lumber Company (Lampert) to redeem all shares held by respondents in the company because Lampert did not make available to respondents the identical redemption offers made earlier by it to several other shareholders. Lampert appeals from the judgment. We reverse.

## FACTS

Lampert is a Minnesota corporation selling building supplies. It operates a number of retail building centers in several neighboring states and employs approximately 650 people. The individually named appellants comprise the board of directors of Lampert with the exception of one recently elected member and another who has died since commencement of this action.

Respondents are ten individual shareholders of Lampert. Several are also trustees of three separate trusts which own stock in the company. The individual respondents and the trusts they represent own a total of 11,980 shares, or approximately 10% of Lampert's issued and outstanding stock. None of the respondents are directors, officers or employees of the company.

Lampert was founded in 1924 by three brothers, Leonard Lampert, Jr., Jacob Lampert, and Arthur J. Lampert. Its initial shareholders included the three brothers, a sister Edna Walling and William J. Huch, an employee of the company and father of several of the respondents, who owned 3½% of the issued stock.

Since its formation the number of shareholders has increased from 4 to 122 through gifts and sales of stock.

John R. Lampert, the company's President and CEO, is the largest single shareholder owning approximately 11% of Lampert's issued stock. The Lampert family own collectively approximately 70% of the company's stock. The remaining 30% is held by the respondents who own 10% of the stock and 90 other shareholders not related to either the Lampert family or respondents who own approximately 20%.

Lampert stock has never been registered for public sale and is not traded on any securities market. Thus, no market exists for the company stock other than through redemptions by Lampert or sales by shareholders of their stock to third persons. There are no restrictions on the sale or transfer of Lampert stock.

Beginning in the late 1950's Lampert agreed to purchase the stock of individual shareholders. Shareholders interested in selling their stock to the company would submit their requests to a Lampert officer who would then approve the request, and the board of directors would later ratify the transaction. Between the late 1950's and 1982, there were approximately eighty-five separate redemptions made by Lampert of shareholder's stock. Only two of the eighty-five redemptions made during that period involved transactions in excess of 1000 shares.

In 1957, Lampert began maintaining ledger accounts for John R. Lampert's sister, Sarah Lampert Bergen. The account was funded by dividends from her stock and proceeds of sales of her stock to the company. Bergen used the account for her personal use to pay bills and to buy clothes and other items.

Bergen's account would, on occasion, have a negative balance and the company would pay her bills until additional funds were generated to refund the account. In the late 1970's Bergen's debit balances steadily increased and in 1980 Lampert's Board of Directors, at the initiation of John R. Lampert, who did not think it was fair for his sister "to be leaning on the company," decided to purchase Bergen's stock as a means of disposing of her ledger account. On July 25, 1980, Lampert purchased Bergen's 7,222 shares at a price of $177.13 per share for a total price of approximately $1.2 million, payable over a term of years with interest at the prime rate.

Minutes of the board meeting reflect no discussions concerning the particulars of the redemption; no information or reports were prepared or presented to the board for its consideration; no shareholder vote was taken. John R. Lampert testified that he was not concerned about the redemption, only the interest rate due his sister on the outstanding balance.

At this time no other shareholders, including respondents, had requested that the company purchase their stock.

In November of 1980, Lampert redeemed at book value of $183.00 per share stock held by the estate of Geraldine Lampert, John R. Lampert's mother, for a total of $386,062.96. In February, 1981, Lampert redeemed at book value of $173.52 per share, all stock held by John R. Lampert's first cousin, Willis L. Walling, for a total of $423,562.32. From July, 1980 to February, 1981 Lampert redeemed over two million dollars in stock at book value from Lampert family members.

Respondents were not notified of these redemptions until the annual shareholders meeting on March 10, 1981.

In May, 1981, respondents requested that Lampert purchase their stock at book value of approximately $2 million.

The board discussed the request at its meeting on July 6, 1981 and decided to further study the matter of company stock purchases. John Lampert testified he was concerned that if the company purchased the respondents' stock, other large shareholders would also wish to sell their stock creating a "run on the bank" at a time when the company, due to the prevailing economic climate, could ill afford to pay out such large amounts of money.

On September 23, 1981, Lampert's board passed a resolution suspending company redemption of stock and declining all outstanding redemption requests. Respondents' request was the only one before the board at the time, all other requests having been honored before the suspension was adopted, including a request made by Judy Moser, a relative, and Lauren Solum, a former employee and board member.

Respondents' request for redemption was the first request to be denied in the history of the company.

John R. Lampert testified the reason he recommended to the Board that it suspend stock redemptions was his concern with Lampert's poor financial outlook and the deteriorating condition of the general economy.

Despite the stated purpose of conserving capital, Lampert continued to pay cash dividends each year following the suspension of redemptions.

Because Lampert has not been able to devise an affordable and fair stock purchase plan for all its shareholders, it has continued the suspension policy to date.

In July of 1983 respondents renewed their request to Lampert to purchase their stock for $2.5 million payable at closing. It was denied and respondent brought this action to force the stock purchase.

The trial court concluded Lampert should be treated as a closely held corporation and that Lampert's board breached a fiduciary duty to respondents by their actions in purchasing the stock of Sarah Bergen at book value. It ordered Lampert to purchase respondents stock at a price of $171.65 per share, the market value of the stock the day they first requested redemption on May 20, 1981. Lampert appeals from this judgment.

## ISSUES

1. Did the trial court err in determining that Lampert is obligated to purchase respondents stock based upon Minn.Stat. § 302A.751, subd. 2 (1984)?

2. Did the trial court err in determining that Lampert is obligated to purchase respondents stock based upon the equal opportunity rule first enunciated in *Donahue v. Rodd Electrotype Co. of New England, Inc.*, 367 Mass. 578, 328 N.E.2d 505 (1975)?

3. Did the trial court err in determining that Lampert is obligated to purchase respondents stock because of a violation of Minn.Stat. § 302A.251 (1984)?

## ANALYSIS

The trial court identified three separate bases for its decision: (1) Minn.Stat. 302A.751, subd. 2 (1984) authorizes use by the court of the remedy of a mandatory buy-out when the directors of a corporation act in a manner "unfairly prejudicial toward one or more shareholders"; (2) Under the equal opportunity rule first enunciated in *Donahue v. Rodd Electrotype Co. of New England, Inc.*, 367 Mass. 578, 328

N.E.2d 505 (1975), the majority shareholders in a close corporation owe a fiduciary duty to the minority which requires that if the corporation purchases the stock of a member of the controlling shareholder group, it must also offer all other shareholders an equal opportunity to sell their stock on the same terms, and; (3) Lampert's Board violated the standard of conduct set forth in Minn.Stat. § 302A.251 (1984) by redeeming Bergen's stock without adequate consideration given for the consequences of its decision to the corporation or its shareholders.

■ 1. Minn.Stat. § 302A.751 confers upon trial courts the power to grant just and equitable relief when the directors of a corporation have acted "fraudulently, illegally, or in a manner unfairly prejudicial toward one or more shareholders * * *. Minn.Stat. § 302A.751, subd. 1(b)(2) (1984). Subdivision 2 of the same statute authorizes a court to order a buy-out of a shareholder's stock in an action under subdivision 1(b) "involving a *closely held corporation* at the time the action is commenced * * *." *Id.* subd. 2 (emphasis added). Thus, the specific equitable remedy of a buy-out is only available if the corporation is closely held.

Under the Minnesota Business Corporation Act a closely held corporation is defined as "a corporation which does not have more than 35 shareholders." *Id.* § 302A.011, subd. 6a.

Here the court found that Lampert has 122 shareholders, 80 of whom are unrelated to any of the parties in this litigation. Under the objective standard of Minn.Stat. § 302A.011, subd. 6a, the equitable remedy of a buy-out is not available.

Respondents contend there is ample authority in Minn.Stat. § 302A.751, subd. 1 to support the equitable relief ordered by the court, regardless of whether the company is closely held. Prefacing subdivision 1 is the directive that the court may "grant any equitable relief it deems just and reasonable in the circumstances * * *." *Id.* § 302A.751, subd. 1. Because an order requiring redemption is an equitable remedy, the trial court had the statutory authority under subdivision 1 to order Lampert to redeem respondents' stock.

Respondents' construction of Minn.Stat. § 302A.751 is erroneous for several reasons. First, because the statute expressly articulates the circumstances under which a buy-out remedy is available, under the doctrine of "the expression of one thing is the exclusion of another" the remedy is limited exclusively to such circumstances. *See Cohen v. Gould,* 177 Minn. 398, 405, 225 N.W. 435, 438 (1929) (where a statute enumerates the person or things to be affected by its provisions, there is an implied exclusion of others). The only provision in the statute which identifies the equitable remedy of a buy-out is subdivision 2 which pertains exclusively to closely held corporations. As such, the remedy is not generally available where the company involved is not closely held.

Secondly, respondents' construction of Minn.Stat. § 302A.751 would effectively nullify the language in subdivision 2 limiting a buy-out to actions involving closely held corporations. If a buy-out remedy is available under subdivision 1 regardless of whether the corporation is closely held, the language of subdivision 2 limiting the same remedy to close corporations would become superfluous. It is elementary under the rules of statutory construction that the legislature intends the entire statute to be effective. *See* Minn.Stat. § 645.17(2) (1984).

■ 2. The trial court determined that respondents are entitled to a forced redemption under either Minn.Stat. § 302A.751 or the equal opportunity rule enunciated in *Donahue v. Rodd Electrotype Co. of New England, Inc.,* 367 Mass. 578, 328 N.E.2d 505 (1975). The *Donahue* court held that the majority shareholders in a close corporation owe a fiduciary duty to the minority, and this duty requires that if the majority causes the corporation to purchase the stock of a member of the controlling shareholder group, it must also cause

the corporation to offer all other shareholders an equal opportunity to sell their stock to the corporation on the same terms. *Id.* at 597–599, 328 N.E.2d at 518.

The *Donahue* court expressly limited its holding to situations involving closely held corporations. *Id.* at 584–585, 328 N.E.2d at 511. Respondents maintain that Lampert is, under the common law definition, a close corporation and therefore *Donahue* should apply to the present case provided all other elements of the equal opportunity rule have been met.

Under the common law the dominant characteristic of a close corporation is the lack of a ready public market for the sale of shares of the corporations stock. F. H. O'Neal, *Close Corporations* 1.02 (2d ed. 1971). Here, admittedly, there is no public market for the sale of respondents' stock in Lampert. They lost, after the company's suspension policy was enacted, all means of liquidating their investment in the corporation. In addition, respondents are without board representation and thus have no control over corporate decisions now or in the future involving their stock in the company.

Despite all this, respondents cannot rely on the "common law of corporations" because Minnesota has already codified in Minn.Stat. § 302A.751 the conditions necessary for a court to order a corporation to buy-out the stock of aggrieved shareholders. Although Lampert may exhibit under the common law definition certain characteristics of a close corporation, under Minnesota statutory law there is only one factor used to make such a determination, namely, whether the objective numerical standard has been met. Because Lampert is not a close corporation within the meaning of Minn.Stat. § 302A.011, subd. 6a, respondents reliance on *Donahue* must fail.

 3. The third basis for the trial court's decision ordering Lampert to redeem all shares of respondents' stock was its conclusion that the company's board violated their fiduciary obligations set forth at Minn.Stat. § 302A.251 by failing to exercise reasonable care in approving the purchase of Bergen's stock.

Minn.Stat. § 302A.251 sets forth the standard of conduct for the directors of a corporation. Subdivision 1 provides in part that:

A director shall discharge the duties of the position of director in good faith, in a manner the director reasonably believes to be in the best interests of the corporation, and with the care an ordinarily prudent person in a like position would exercise under similar circumstances.

Minn.Stat. § 302A.251, subd. 1 (1984).

Under Minnesota law, directors are liable for losses or harm to the corporation as a result of their breach of their fiduciary obligations. *See Lake Harriet State Bank v. Venie*, 138 Minn. 339, 346–47, 165 N.W. 225, 228–29 (1917). Specifically, the Minnesota Supreme Court has stated that:

The directors of a corporation occupy a fiduciary relation to it which imposes upon them the duty to use the authority given them solely for the benefit of the corporation and its stockholders, and to exercise ordinary business care and diligence.... [If they breach this duty] they are liable to the corporation for any losses resulting from such misuse of authority for neglect of duty.

*Id.* *See also* H. Henn and J. Alexander, *Laws of Corporations* 624 (3d ed. 1985) ("Even when the required duty of care has not been exercised, the directors, officers, or controlling shareholders are only liable, under the causation rules of negligence law, for such loss to the corporation as was caused by their negligence").

Here the respondents did not argue and the trial court did not find, that the director's decision to purchase Bergen's stock harmed the corporation in any way.

## DECISION

Reversed.